Filed Date: 1/4/2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

TONY DUNBAR,

               Petitioner

   -against-

T. GRIFFIN,

               Respondent.
-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
No. 11-CV-5858

**AMON, United States District Judge:**

On May 11, 2021, I reserved decision on the government's motion to vacate the stay nunc pro tunc and dismiss petitioner Tony Dunbar's ("Dunbar's") petition for a writ of habeas corpus as untimely, pending further briefing on whether Dunbar's belated filing should be excused due to actual innocence. For the reasons stated below, I find that the belated filings are not excused by actual innocence. Accordingly, the government's motion to vacate the stay and dismiss the petition as untimely is GRANTED and the petition for writ of habeas corpus is dismissed as time barred.

## BACKGROUND

On or about August 14, 2006, Dunbar was indicted in New York state court on one count of attempted murder in the second degree, one count of assault in the first degree, one count of assault in the second degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. (ECF Docket Entry ("D.E.") # 21-6 ("State Ct. Order") at 1-2.[1]) The charges arose out of a shooting that occurred at approximately 1:10AM on June 18, 2006. (D.E. # 20 ("Pet'r's Br.") at 16.) Jamal Singleton

---

[1] Citations to specific pages in docket entries reference page numbers generated by the ECF system, not internal pagination.

("Singleton") testified at trial that, while crossing the street, he was approached by two men, one in a wheelchair, and a woman. (D.E. # 21-7 ("Trial & <u>Wade</u> Hr'g Tr.") at 400-01.) When the group was arm's length from him, with good lighting conditions, the man in the wheelchair asked Singleton, in substance, whether he was a member of the Crips gang. (<u>Id.</u> at 402-03.) Singleton responded affirmatively. (<u>Id.</u> at 405-06.) After Singleton asked the man who he was multiple times, the man took out a .38 revolver and shot Singleton three times from four-to-five foot range. (<u>Id.</u> at 408-10.) A police officer testified at the <u>Wade</u> hearing that he arrived at the scene, and Singleton described the shooter. (<u>Id.</u> at 11.)

At approximately 2:20AM, police stopped Fernard Dickson[2], a man in a wheelchair walking with a group of people including a woman, at a nearby intersection, but released him after questioning and frisking him. (D.E. # 20-2 at 1.) The NYPD came to suspect Dunbar, as he used a wheelchair, lived close to the location of the shooting, and was currently on parole. (Trial & <u>Wade</u> Hr'g Tr. 14-15.) A month after the shooting, Singleton identified Dunbar as the assailant from a photographic array and subsequently from a police lineup. (<u>Id.</u> at 17-18.) Singleton's mother additionally told Detective Alan Killigrew that she had heard rumors that a person nicknamed "Tough Tony" or "Pretty Tony" had shot her son. (<u>Id.</u> at 13.)

At trial, Singleton again identified Dunbar as the man in the wheelchair. (<u>Id.</u> at 416.) Defense counsel cross-examined Singleton vigorously about the inconsistencies between Singleton's statements at trial, during the initial police interview, and during his grand jury testimony. (<u>Id.</u> at 425-47.)

---

[2] In various state court documents, Dickson is alternately referred to as "Dickson Fernard," (D.E. # 20 at 16), "Fernard Dixon," (D.E. ## 20 at 22, 20-2 at 1) and "Fernerd Dixon" (D.E. # 21-7 at 497-99). For consistency, I refer to him herein as "Dickson."

The parties contested whether Dunbar was wheelchair-bound on June 18, 2006. (Id. at 103.) The judge ruled that if the wheelchair issue were contested at trial, then the fact that Dunbar was in a wheelchair because he had been injured in a prior shooting would become relevant. (Id.) Accordingly, the parties stipulated that "between the period of approximately April 21, 2006, and July 31, 2006, the defendant Tony Dunbar required periodic use of a wheelchair." (Id. at 388.) Dunbar, however, decided to take the stand and deny that he was still using a wheelchair on June 18, 2006. (Id. at 555.) Dunbar took the stand against the advice of counsel, his mother, and his brother. (Id. at 524.) With the door opened to testimony about the wheelchair, the government called Dunbar's parole officer, who testified to having seen Dunbar using a wheelchair until approximately mid-July. (Id. at 619-20.) Dunbar's testimony also allowed the prosecution to emphasize Dunbar's past gang affiliation during cross-examination. (Id. at 560-62.) During his testimony, Dunbar did not claim an alibi. (See id. at 549-77.) Instead, he claimed simply that Singleton's identification was mistaken and that he was no longer a gangmember. (See,e.g., id. at 551.)

Additionally, the detective who arrested Dunbar testified that Dunbar was not wearing eyeglasses upon arrest. (Id. at 473.) Dunbar and his counsel made no mention of his glasses.

Dunbar was convicted by the jury and was sentenced to concurrent sentences of twenty years for the attempted murder charge and ten years for the weapon possession charge on August 15, 2007. (D.E. # 1 at 2.) Dunbar appealed his conviction, and on June 22, 2010, the Second Department affirmed. People v. Dunbar, 905 N.Y.S.2d 222, 225 (App. Div. 2010). The Court of Appeals denied Dunbar's application for leave to appeal. People v. Dunbar, 935 N.E.2d 820 (N.Y. 2010). Subsequently, Dunbar moved pro se for a writ of error coram nobis on the grounds of ineffective assistance of counsel; the Second Department denied that motion on April 17, 2012.

3

People v. Dunbar, 942 N.Y.S.2d 376 (mem.) (App. Div. 2012). The Court of Appeals denied Dunbar's application for leave to appeal. People v. Dunbar, 975 N.E.2d 918 (N.Y. 2012).

On November 25, 2011, Dunbar filed a pro se petition for habeas corpus pursuant to 28 U.S.C. § 2254. He also filed a motion to stay this case "so that he can exhaust additional claims in state court through a post-judgment collateral motion pursuant to N.Y. CPL § 440.10." (D.E. # 10 at 1-2.) I granted the request for a stay, subject to certain conditions, including that Dunbar was to "return to this Court and file an amended habeas petition within thirty (30) days of a final state court decision on his § 44[0].10 motion" and that the stay would be vacated should he fail to do so. (Id.)

This case remained dormant for the next eight years. On February 8, 2021, Dunbar—now represented by counsel—reappeared to request a briefing schedule for his amended petition. Dunbar's counsel reported that, while this case had been stayed, Dunbar "filed a pro se motion to vacate, which was denied . . . and this office filed a motion to vacate, which was ultimately denied . . . on January 22, 2021." (D.E. # 12.) In filing his request on February 8, 2021—seventeen days after January 22, 2021—Dunbar appeared to comply with the order that he return to this Court within thirty days of a final state court decision. That same day I granted the request and ordered a briefing schedule.

Respondent then filed a motion to vacate the stay and dismiss the petition as untimely. The government's motion identified facts not disclosed in Dunbar's letter. As set forth in the government's papers, the following undisputed timeline of events unfolded:

- August 8, 2012: Dunbar is denied leave to appeal his coram nobis motion.
- September 4, 2015: Dunbar files a pro se § 440.10 motion.
- June 16, 2016: Dunbar's pro se § 440.10 motion is denied.
- July 11, 2017: Dunbar is denied leave to appeal his pro se § 440.10 motion.
- March 6, 2020: Dunbar, represented by counsel, files a second § 440.10 motion.

4

- September 3, 2020: Dunbar's second § 440.10 motion is denied.
- January 22, 2021: Dunbar is denied leave to appeal his second § 440.10 motion.

(See D.E. # 13; D.E. # 16 and exhibits.)  Dunbar responded that, even if he breached the requirements of the stay, the time bar did not apply because he is actually innocent. (D.E. # 15 at 2.)

On May 11, 2021, I reserved decision on the government's motion "pending further briefing on the issue of whether Dunbar's belated filing should be excused due to actual innocence."  (D.E. # 18 at 8.)  That issue has now been fully briefed.

## DISCUSSION

I.    Standard of Review

"[A] state prisoner ordinarily has one year to file a federal petition for habeas corpus, starting from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'"  McQuiggin v. Perkins, 569 U.S. 383, 388-89 (2013) (quoting 28 U.S.C. § 2244(d)(1)(A)).  Federal law pauses the one-year filing deadline during the pendency of a "properly filed application for State post-conviction or other collateral review."  28 U.S.C. § 2244(d)(2).  This tolling provision allows a petitioner to first exhaust his claims in state court without running afoul of the one-year deadline.  Sometimes, however, a petitioner will file a federal habeas petition that contains both exhausted and unexhausted claims— a so-called "mixed petition."  Faced with such a petition, a district court may stay the case and hold the petition in abeyance to provide the petitioner an opportunity to exhaust the unexhausted claims in state court.  Rhines v. Weber, 544 U.S. 269, 279 (2005).  "A mixed petition should not be stayed indefinitely," however, and courts "should place reasonable time limits on a petitioner's trip to state court and back."  Id. at 277–78.

If a "condition of the stay is not met, the stay may later be vacated nunc pro tunc as of the date the stay was entered, and the petition may be dismissed (unless the time the petitioner has taken to initiate exhaustion in the state courts and to return to federal court after exhaustion has not consumed" the remaining portion of the limitations period). Zarvela v. Artuz, 254 F.3d 374, 381 (2d Cir. 2001). Accordingly, courts will dismiss the exhausted and unexhausted claims of a mixed petition where a petitioner fails to return to federal court in the time allotted under the stay. See, e.g., George v. Berbary, No. 05-cv-2199 (ARR), 2007 WL 2769492, at *2-3 (E.D.N.Y. Sept. 21, 2007) (vacating stay and dismissing entire mixed petition "[i]n light of petitioner's failure to return to federal court in a timely fashion after seeking to exhaust his state court remedies"); Taylor v. Brown, No. 06-cv-7675 (LTS) (KNF), 2009 WL 400365, at *3, *5 (S.D.N.Y. Jan. 30, 2009) (same), report and recommendation adopted, 2009 WL 2448587 (S.D.N.Y. Aug. 11, 2009).

Even after violating a stay and running past the limitations period, however, a prisoner may avoid the procedural bar upon proof of "actual innocence." McQuiggin, 569 U.S. at 386. This "'gateway' to merits review of defaulted claims for habeas petitioners" is "narrow." Hyman v. Brown, 927 F.3d 639, 643 (2d Cir. 2019). "That narrow class of 'truly extraordinary' cases consists of those presenting credible and compelling claims of actual innocence." Id. at 656 (quoting Schlup v. Delo, 513 U.S. 298, 338 (1995) (Rehnquist, C.J., dissenting)). In reviewing an actual innocence claim, a court considers all evidence without regard to the rules of admissibility that would govern at trial. House v. Bell, 547 U.S. 518, 538 (2006).

In order to carry the "deliberately 'demanding'" burden of proving actual innocence, the petitioner must "adduce 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Id. at 656 (first quoting House, 547 U.S. at 538; and then quoting Schlup, 513 U.S. at 324).

6

Moreover, that evidence must be "compelling," meaning that it provides "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Id. at 657 (quoting Schlup, 513 U.S. at 316). Although "[t]he new evidence need not demonstrate factual innocence to an 'absolute certainty'" in order to be credible and compelling, it must "allow a federal court to conclude that 'more likely than not . . . any reasonable juror would have reasonable doubt." Id. (quoting House, 547 U.S. at 537).

Accordingly, evidence that points to "mere legal insufficiency" rather than to "factual innocence" is insufficient to prove actual innocence. Id. (quoting Bousley v. United States, 523 U.S. 614, 623 (1998)). Instead, courts have found evidence credible and compelling where "the new evidence directly supported petitioner's factual innocence by indicating either that he did not commit, or could not have committed, the crimes of conviction." Id. at 665. Evidence which is merely inconsistent with that presented at trial will not necessarily suffice. See, e.g., Cosey v. Lilley, 460 F. Supp. 3d 346, 375 (S.D.N.Y. 2020).

II.    Discussion

Dunbar returned to federal court over a year after the date required by the stay. Accordingly, unless he can overcome § 2244(d)(1)(A)'s procedural bar, his stay should be vacated nunc pro tunc and his entire petition dismissed as time barred. See Zarvela, 254 F.3d at 381; see, e.g., George, 2007 WL 2769492, at *2-3. Dunbar offers five main pieces of evidence that he claims support a finding of actual innocence, which would excuse his belated filing:

    a. The expert report of Dr. Margaret Kovera;
    b. The affidavits of Alex Dunbar, Tony Brown and Sandra Navedo;
    c. The DD5 of Tony Dunbar being questioned while he was on crutches over a
    month prior to the shooting;
    d. The DD5 report regarding Fernard Dickson; and
    e. The evidence that Mr. Dunbar was wearing glasses at the time of the shooting.

7

(D.E. # 22 at 2.) For the reasons explained below, none of the evidence supports such a finding.

A. The expert report of Dr. Margaret Kovera

Dunbar asserts that Singleton's eyewitness identification is "highly susceptible to a confident misidentification" and is at "substantial risk for being unreliable." (Pet'r's Br. 8.) In support of this claim, he submits a new affidavit from an expert in eyewitness identification, Dr. Margaret Kovera ("Dr. Kovera"). (D.E. # 20-4.) In this affidavit, Dr. Kovera discusses factors that could have impacted Singleton's identification of Dunbar, such as stress, weapon focus, multiple perpetrators, the exposure duration and time estimation of the witness' proximity to the shooter, the passage of time, non-blind lineup administration, lineup composition, repeated identifications, lineup instructions, and in-court identification. (Id. at 8-9.)

Although Dr. Kovera's testimony was not specifically produced to the jury, the subject of potential misidentification was well-probed at trial. On cross-examination, Dunbar's lawyer questioned Singleton on the depth of his memory and things he may have forgotten, (Trial & Wade Hr'g Tr. 439-40, 446-47), and the fact that he was not fully paying attention to the three people who approached him, (id. at 442). In his closing statement, counsel argued that because of "the time frame and the fact that [Singleton] was focusing or looking at . . . three different people . . . he did not and never did get a good full look at the shooter, and that's why you have the general vague description." (Id. at 649; see also id. at 651 (discussing the speed of the shooting and arguing that Singleton "did not get a good look at the shooter whatsoever").) He argued that the identification could have been tarred by the fact that it was dark when the shooting occurred. (Id. at 650.) And he argued that Singleton might have identified Dunbar incorrectly because he was in shock after being shot multiple times. (Id.) While counsel's arguments were not entirely coextensive with Dr. Kovera's arguments, they covered much of the same ground. Courts have

8

been wary of finding evidence of actual innocence where supposedly new evidence does little more than provide further evidence of an argument raised at trial. See, e.g., Johnson v. Hofmann, No. 06-cv-81, 2006 WL 3487633, at *6 (D. Vt. Dec. 1, 2006).

Additionally, Dr. Kovera's testimony does not compel the conclusion that Singleton mistakenly identified Dunbar. The report was issued over a decade after the shooting and was formulated without any direct communication with witnesses. (D.E. # 20-4.) Dr. Kovera's opinion that one might doubt eyewitness identifications made in similar circumstances is insufficient to compel the conclusion that the instant identification was incorrect.[3]

Even if Dr. Kovera's report were enough to compel the conclusion that Singleton may have been mistaken, the new evidence must prove that Dunbar "did not commit, or could not have committed, the crimes of conviction." Hyman, 927 F.3d at 665. Here, the identification expert's affidavit merely challenges the credibility of Singleton's identification of Dunbar. Dr. Kovera's report strengthens Dunbar's case that he was misidentified, but it fails to prove actual innocence because it does not prove that he did not shoot, or could not have shot, Singleton. See id. at 664-65 ("The new evidence established that Ellis . . . lied in identifying Hyman . . . . Ellis's failure to see the shootout means she cannot inculpate petitioner (or anyone else), but neither can she exonerate him. Whatever question that might raise as to the sufficiency of the prosecution's case absent Ellis's testimony, it does not indicate Hyman's likely innocence, much less do so compellingly."); see also Fabers v. Lamanna, No. 18-cv-2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020) (holding that "[n]ew evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate" actual innocence because evidence must do more than create "'a credibility contest' between the prosecution's case at trial and the newly discovered

---

[3] Although Dunbar cites multiple cases discussing problems with eyewitness identification, (see D.E. # 22 at 3), those cases were not analyzing the actual innocence standard.

evidence" (quoting Rosario v. Ercole, 582 F. Supp. 2d 541, 559 (S.D.N.Y. 2008)).  Accordingly, Dr. Kovera's report does not support a finding of actual innocence.

B.  The affidavits of Alex Dunbar, Tony Brown and Sandra Navedo

Dunbar proffered affidavits from his mother and two brothers that alleged (i) Dunbar was at home with them at the time of the shooting, and (ii) Dunbar no longer used a wheelchair at the time of the shooting.  (D.E. # 20-5; D.E. # 20-6; D.E. # 20-7.)  The affidavits are dated post-trial and so this testimony was not heard by the jury.

As an initial matter, Dunbar's failure to explain his delay in presenting testimony from his family members "bears on the determination whether the petitioner has made the requisite showing" of actual innocence.  McQuiggin, 569 U.S. at 399.  In McQuiggin, the Supreme Court noted that the submission of new evidence and a petition after a "witness has died and cannot appear at a hearing to rebut new evidence . . . should seriously undermine the credibility of the actual-innocence claim."  Id.  Here, the testimony encapsulated in these affidavits was not submitted at trial, but was instead sworn to years after Singleton was murdered in 2011.  (Pet'r's Br. 10 n.7.)  This delay undermines their credibility not only because it creates questions as to the motive of the affiants, but also because the delay could undermine the affiants' ability to remember very specific details about the night of the crime.  See Fernandez v. Annucci, No. 17-cv-3943 (JMA), 2019 WL 1025816, at *5 (E.D.N.Y. Mar. 4, 2019).

Additionally, although an undeniable alibi can sufficiently prove actual innocence, see, e.g., Rivas v. Fischer, 687 F.3d 514, 552 (2d Cir. 2012), courts generally hold alibi affidavits from relatives insufficiently credible to compel a reasonable juror to acquit, see, e.g., Colon v. Sheahan, No. 13-cv-6744 (PAC) (JCF), 2016 WL 3919643, at *16 (S.D.N.Y. Jan. 13, 2016), report and recommendation adopted, 2016 WL 3926443 (S.D.N.Y. July 14, 2016); Philbert v. Brown, No.

10

11-cv-1805 (NGG), 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012).  This is due to concerns that these types of witnesses "[o]bviously . . . have reason to lie to protect petitioner." Garcia v. Portuondo, 334 F. Supp. 2d 446, 456 (S.D.N.Y. 2004); see Lawrence v. Greene, No. 06-cv-0202 (DLI), 2011 WL 1327128, at *7 (E.D.N.Y. Mar. 31, 2011) ("[A] reasonable juror would likely question whether the alibi affidavits obtained by Petitioner [from relatives and his co-defendant] in fact came from trustworthy sources.").  These credibility concerns are intensified by Dunbar's failure to testify to an alibi defense when he chose to testify on his own behalf.  Further, the alibis are not compelling in that they place Dunbar a mere two blocks from the scene of the crime.

With respect to the affiants' testimony regarding Dunbar's use of a wheelchair, this issue was well-covered during the trial.  Dunbar's parole officer testified that Dunbar was consistently in a wheelchair when he saw him every two weeks through July 12, 2006, and that Dunbar was out of the wheelchair and using crutches for the first time on July 25, 2006—well after Singleton was shot by an assailant in a wheelchair on June 18, 2006.  (Trial & Wade Hr'g Tr. 619-21.)  In addition to concerns about bias from relatives, Garcia, 334 F. Supp. 2d at 455-56, Dunbar's proffered evidence on this issue merely contradicts what has already been established on the record.  As discussed above, evidence that is merely inconsistent with that presented at trial will not necessarily suffice to prove actual innocence. See Diaz v. Bellnier, 974 F. Supp. 2d 136, 145 (E.D.N.Y. 2013).  For these reasons, Dunbar's newly proffered affidavits are not sufficiently probative to advance his actual innocence claim.

C.  The DD5 of Dunbar being questioned

Dunbar states that he discovered a police report that showed that he began to stop using a wheelchair as early as May 10, 2006.  (D.E. # 20-1.)  He argues that it "supported his trial testimony that he was not in a wheelchair as of June 18, 2006."  (Pet'r's Br. 6.)  The DD5 shares a major

deficiency with the affidavits.  Dunbar's use of a wheelchair was well-covered at trial, and at best the DD5 would have given the jury a reason to doubt Dunbar's parole officer's testimony.  It does not prove his actual innocence.  Moreover, the DD5 conflicts with Dunbar's arguments stemming from the affidavits.  According to the affidavits, Dunbar stopped using a wheelchair on June 7, 2016, the day on which his physical therapist allegedly told him he could stop using a wheelchair. (See D.E. # 20-5 at 2; D.E. # 20-6 at 1-2; D.E. # 20-7 at 1.)  Given that Dunbar admits using a wheelchair on June 7, 2006, the DD5 indicates only that Dunbar did not use the wheelchair on a certain day, not that he did not use it any time after May 10, 2006.  Accordingly, it does not compel the conclusion that Dunbar was not in a wheelchair on June 18, 2006.

D. The DD5 report regarding Fernard Dickson

Dunbar proffered evidence suggesting that there was another potential suspect fitting Singleton's description of the assailant.  (D.E. # 20 at 6, 18.)  The police stopped and frisked Dickson "based on the description of a male black in a wheelchair with a female in light clothing," but they released him without further investigation.  (D.E. # 20-2 at 1.)  This evidence does not compel the conclusion that Dickson, rather than Dunbar, shot Singleton.  Aside from being in a wheelchair and being with a woman, Dickson did not match the remainder of Singleton's description of the shooter:  there is no indication that Dickson was wearing clothing similar to the shooter; Dickson was with a group of "several people some of which were female," whereas the shooter was with a lone female, (id.); and Dickson was more than half a mile from the scene of the crime.  That another wheelchair-bound man was somewhere in the vicinity of the shooting over an hour after the shooting would not compel a reasonable jury to acquit Dunbar.

E.  The evidence that Mr. Dunbar was wearing glasses at the time of the shooting

Dunbar argues that he regularly wore prescription eyeglasses at the time of the shooting and that Singleton did not mention eyeglasses when describing the perpetrator to the police.  (D.E. # 20 at 2-3.)  He proffers evidence that he wore eyeglasses when he was in custody in 2001.  (D.E. # 20-3.)  The jury did not hear any evidence that Dunbar wore eyeglasses.

Although Dunbar was vocal in his defense, he did not argue that he always wore glasses until after trial.  As with the alibi defense, this delay undermines the credibility of Dunbar's assertion that he always wears glasses.  See supra Part II.B.  Moreover, that Dunbar claims he always wore glasses would not compel a jury to believe that he must have been wearing glasses on June 18, 2006.  This is especially true where the detective who arrested Dunbar testified at trial that he was not wearing glasses upon arrest.  (Trial & Wade Hr'g Tr. 473.)  Unlike facial features, skin tone, or build, glasses are not a permanent feature of a person and "are readily removed and replaced."  Fields v. New York, No. 18-cv-2579 (CBA), 2021 WL 3741506, at *13 (E.D.N.Y. Aug. 24, 2021) (discussing hats); see also United States v. Morgan, 690 F. Supp. 2d 274, 289 n.75 (S.D.N.Y. 2010) ("Glasses do not change a person's facial structure, their skin tone, build, or facial features.").  Because glasses are removable, Dunbar's evidence that he wore glasses in 2001 does not indicate that Dunbar wore glasses full-time in 2006 or that Dunbar could not have been the assailant.  It merely demonstrates that, much like a significant portion of the population, Dunbar does not have perfect eyesight.  This evidence is therefore not compelling.

F.  Other Arguments

a.  Affidavit of Retired Detective Elpidio DeLeon

Dunbar next proffers the affidavit of Elpidio DeLeon, a private investigator who interviewed an alleged witness, Shaquana Taylor.  (D.E. # 20-11 at 1.)  This interview occurred

on August 15, 2017, more than eleven years after the shooting. (Id.) According to DeLeon, Taylor stated that "she knows who shot Jamal Singleton" and "that Tony Dunbar was not the person that shot Jamal Singleton." (Id.)

There is no factual basis for the claim that Taylor was a witness to the shooting. Taylor did not testify at trial; her name does not appear in the police reports; DeLeon does not explain how Taylor purports to know who shot Singleton; and Taylor did not agree to provide an affidavit. Along with the fact that this evidence is pure hearsay and comes more than a decade after the shooting, these factors undermine the credibility of DeLeon's affidavit. Additionally, Taylor's tenuous (potentially nonexistent) relationship to the case, her vague statements within DeLeon's affidavit, and the late timing of DeLeon's affidavit indicate that this affidavit is not compelling. See Lanier v. Lee, No. 17-cv-0089 (LEK), 2017 WL 4838781, at *5 (N.D.N.Y. Oct. 24, 2017) (holding that similar vague, unsworn statements cannot prove actual innocence where they "merely contradict[], without elaboration, eyewitness evidence at trial that Petitioner was the shooter"). Accordingly, the affidavit does not support a finding of actual innocence.

      b. The Trial Evidence

Finally, Dunbar argues that Singleton's statements throughout the cases' pendency varied significantly, such that his identification of Dunbar was suspect. However, Dunbar's counsel cross-examined Singleton at trial regarding all discrepancies in his statements and emphasized on summation that Singleton kept revising his story. (Trial & Wade Hr'g Tr. 425-48, 642-54.) To be "credible," an actual innocence claim must "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Rivas, 687 F.3d at 541 (quoting Schlup, 513 U.S. at 324). Because Singleton's contradictions were extensively probed at trial and have been

14

adjudicated by the jury, they cannot support a credible claim of actual innocence. Moreover, even were they credible, these arguments would not prove that Dunbar "did not commit, or could not have committed, the crimes of conviction." Hyman, 927 F.3d at 665.

## CONCLUSION

For the foregoing reasons, Dunbar cannot meet the actual innocence threshold, and his petition is barred by 28 U.S.C. § 2244(d)(1)(A). (See D.E. # 18 at 7-8.) Accordingly, the government's motion to vacate the stay and dismiss the petition as untimely is GRANTED and the petition for writ of habeas corpus is dismissed as time barred. Because Dunbar has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: January 4, 2022
      Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

15